

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00183-CV

_____

ERIC ANDERSON, AARON GARCIA, ALUM RB, LLC, HERMAN TORRES, IRIS TORRES, AND RB SHIELDS ME, LLC, Appellants

V.

INNOVATIVE INSULATION, INC., Appellee

---

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-324993-21

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

The trial court signed a temporary injunction order enjoining Appellants Eric Anderson, Aaron Garcia, Alum RB, LLC, Herman Torres, Iris Torres, and RB Shields Me, LLC (RBS) from, among other things, soliciting certain customers of Appellee Innovative Insulation, Inc. In three issues, Appellants complain that (1) the trial court erred by enjoining them from soliciting Innovative's customers because the record does not contain a non-solicitation agreement between Appellants and Innovative for the trial court to enforce; (2) the temporary injunction is vague, ambiguous, and unspecific as to Iris Torres and RBS; and (3) there is insufficient proof that but for the temporary injunction, Innovative would suffer a probable, imminent, and irreparable injury. We will affirm.

## II. BACKGROUND

### A. Innovative's Business Selling Radiant Barriers and Innovative's Requirement that Employees Sign an Employment Agreement

Innovative has been in business selling radiant barriers for thirty-four years. At the temporary injunction hearing, Dan Russell, Innovative's president and sole shareholder, testified that Innovative has spent "millions of dollars" over the years attracting its customers through marketing. Innovative's customer information is kept in a software database, and Innovative considers its customer list to be confidential information.

Russell testified that for "[w]ell over 20 years," he has required that Innovative employees sign an employment agreement. He also testified that there has not been any change to Innovative's employment agreement "for the last 15 years." At the hearing, portions of Innovative's form employment agreement were admitted into evidence. The agreement stated that during an employee's employment with Innovative, the employee would have "access to and become familiar with various confidential information and trade secrets" and that the employee was prohibited from disclosing or using Innovative's trade secrets either during or after their employment, except in furtherance of and as required by their employment. Notably, the agreement also contained a non-solicitation agreement that provided: "Employee shall not seek to be in competition with the business of the company to procure orders from or do business with any customer of the company for a period of two (2) years after termination of employment with the [c]ompany."

Russell further testified that for "many, many years," Innovative has had an employee manual and that Innovative requires every employee to sign an acknowledgment that they have had the opportunity to read the employee manual. Among other things, the employee manual provided that, during the course of their employment with Innovative, employees might have access to Innovative's confidential information, that employees were prohibited from misusing Innovative's confidential information, and that employees were prohibited from accepting

3

employment or engaging in any business that might require disclosure of Innovative's confidential information.

## B. Innovative Employs Anderson, Garcia, and Herman Torres

In 2010, Anderson began working at Innovative as its accountant/comptroller. Through his employment, Anderson had access to Innovative's customer list and financial data. At the hearing, Anderson admitted that Innovative employees "were supposed to sign" the employment agreement. He also testified that as of 2018, part of his job duties included having employees sign the employment agreement and having employees sign the acknowledgment of the employee manual.[1] Anderson could not recall whether he had ever signed the employment agreement, and although he had seen the employee manual, he could not recall ever reading it. Russell, however, testified that Anderson had signed both the employment agreement and the acknowledgment of the employee manual.

In 2008, Garcia began working at Innovative as a logistics manager. As a logistics manager, Garcia was "responsible for getting product and then distributing that product to purchasers." Like Anderson, Garcia could not recall whether he had ever signed the employment agreement or the acknowledgement of the employee manual. Russell, however, testified that Garcia had signed both the employment agreement and the acknowledgment of the employee manual.

---

[1]Anderson testified that prior to 2018, Russell's executive assistant was responsible for obtaining the signed acknowledgment from Innovative's employees.

4

In 2010, Herman Torres began working at Innovative as a salesman. He testified that he often used his cell phone to contact Innovative's customers and that he had the contacts for Innovative's customers in his cell phone.[2] Like Anderson and Garcia, Herman Torres testified that he could not recall signing the Innovative employment agreement or the acknowledgment of the employee manual. Russell, however, testified that Herman Torres had signed the employment agreement and acknowledgement.[3]

## C. While Employed by Innovative, Anderson and Garcia Operate Alum, a Competing Business Selling Radiant Barriers

Beginning in 2012 and continuing over the years, Anderson, Garcia, and Herman Torres had several conversations with Russell regarding potentially purchasing Innovative's assets. According to Anderson, Russell had told them to "[d]o whatever you have to do" to raise funds for the purchase. In 2016, Anderson, Garcia, and Herman Torres formed Alum. The three were each listed as managing members on Alum's certificate of formation. According to Anderson, Alum was formed to raise funds to purchase Innovative's assets from Russell. In 2017, Alum filed a certificate of termination with the Texas Secretary of State. Anderson testified that this was

_____

[2]Herman Torres testified that while Innovative had initially provided him with the cell phone, after a complaint that he was using too much data, he reached an agreement with Innovative that he would pay for the cell phone and that it would become his personal property.

[3]Russell testified that he had countersigned Anderson's, Garcia's, and Herman Torres's respective employment agreements.

done because Herman Torres no longer wanted to be a part of Alum. Later that year, Alum was reinstated and soon began operating with Anderson and Garcia as co-managing members.

Anderson testified that Alum began selling radiant barriers after Alum was reinstated in 2017. He admitted that Alum sold products that compete with Innovative, but he justified this as being done "for the purpose of raising money to buy the assets of Innovative[.]" Anderson testified that Alum obtained its customers from Google searches, but he admitted that some of Alum's customers may have been prior customers of Innovative. He also admitted that Alum was operating in competition with Innovative when both he and Garcia were still employed by Innovative. Russell testified that up until early 2021, he had been unaware of Alum's existence and of the fact that Alum was competing with Innovative.

## D. While Herman Torres is Employed by Innovative, His Wife, Iris Torres, Operates RBS, a Competing Business Selling Radiant Barriers

In 2017, the same year that Herman Torres said that he no longer wanted to be part of Alum, his wife, Iris Torres, started a sole proprietorship called RB Shields Me. RB Shields Me was later converted into a limited liability company, RBS.[4] Iris Torres testified that RBS has been selling radiant barriers since 2017. She stated that RBS is different from Innovative because, in addition to selling radiant barriers, RBS also

---

[4]In their briefs, the parties refer to both the sole proprietorship and the limited liability company with the same acronym, "RBS." For simplicity, we will do the same.

sometimes installs them. She also testified that RBS has been one of Innovative's customers since 2017.[5] Iris Torres initially testified that RBS had received "[z]ero" customers from her husband's leads, but she later stated that "maybe he has a couple of times when it's been maybe somebody we've run into, like, from church or something[.]"

Herman Torres testified about an occasion when Innovative was supposed to deliver product to a company called "84 Lumber."[6] He stated that Innovative did not have enough product to fulfill the order, and Russell told him to "handle it." Herman Torres "handled it" by contacting his wife to ask her whether RBS had enough product to fulfill the order. Iris Torres told her husband that RBS could fulfill the order, and it later did so. Herman Torres estimated that the order involved $15,000 to $20,000 worth of product. Iris Torres completed an ACH form requested by 84 Lumber so that RBS could get paid for the order.[7] When she learned that 84 Lumber had contacted Innovative regarding the order, she emailed a representative of

_____

[5]Herman Torres testified that he believed that RBS was Innovative's fourth largest customer.

[6]There is some testimony that 84 Lumber was not the ultimate customer for this order but rather was a company that handled the billing for the ultimate customer. Since it does not impact our analysis, we will treat 84 Lumber as the ultimate customer.

[7]ACH, which stands for "Automated Clearing House," is an electronic payment delivery system that facilitates the electronic payment of funds. *See Slaven v. Livingston*, No. 02-17-00266-CV, 2019 WL 983693, at *9 n.10 (Tex. App.—Fort Worth Feb. 28, 2019, no pet.) (mem. op.).

84 Lumber with her contact information and requested that 84 Lumber contact her regarding the matter. Herman Torres did not tell Russell that he was using RBS to fulfill the order with 84 Lumber. To that end, Russell testified that he was unaware of RBS's existence until around March 2021 and that he did not know that Innovative was purchasing product from a company controlled by Iris Torres.[8]

## E. Anderson, Garcia, and Herman Torres Resign from Innovative, and Their Employment Agreements Disappear from Innovative's Records

Anderson resigned from Innovative in January or February 2021, and Garcia resigned in March 2021.[9] Herman Torres resigned from Innovative twice. First, he resigned on the same day as Garcia in March 2021. About a week later, he went back to work for Innovative after Russell allegedly offered him a bonus and part ownership of the business. However, after two or three weeks, he resigned a second time because, according to him, he did not receive what Russell had promised him when he came back.

---

[8]The record also reflects a connection between RBS and Alum. Anderson testified that RBS was "one of the bigger customers" of Alum. He stated that Alum would supply product to RBS and that he was unsure of RBS's customers. In addition, Iris Torres testified that RBS and Alum had shared the same post office box but that there was no other affiliation between the two entities.

[9]Anderson stated that he resigned from Innovative because "the culture at Innovative was bad" and because Russell had allegedly made disparaging remarks regarding Anderson's practice of his faith. Garcia stated that he resigned due to Innovative's "toxic work environment" and due to Innovative not having enough employees.

As mentioned above, Anderson's job duties included having Innovative's employees sign the employment agreement and the acknowledgment of the employee manual. Russell testified that Innovative's employment agreements had been kept under lock and key in Anderson's office. Russell's former executive assistant testified that the employee acknowledgments were likewise kept locked in Anderson's office. Following Anderson's, Garcia's, and Herman Torres's resignations, Russell looked for their respective employment agreements and acknowledgements, but those agreements and acknowledgements were missing. Russell testified that when he looked through the files, "everybody had their agreements [in the files] except [for Anderson, Garcia, and Herman Torres]."

## F. Appellants' Activities Around and Following Their Resignations

In March 2021, around the time that Herman Torres resigned from Innovative for the first time, he sent an email to a representative of 84 Lumber directing it to "change the name of the company that supplies you with house wrap to: [RBS]." He then provided the 84 Lumber representative with an address for RBS—an address that had also been used by Alum. When asked about the email, Herman Torres confirmed that he was "directing 84 Lumber to consider [RBS] as their new supplier for house wrap." Indeed, when asked about his purpose in sending the email, he stated,

> Well, the purpose is, since the account was under RB Shields Me—I mean, the account was under Innovative Insulation, any deliveries that were sent to the job sites would automatically be credited

9

to Innovative Insulation. Well, since Innovative Insulation did not have the material and was not delivering the material to the job site in a timely manner, Innovative Insulation, in effect, would be getting payment for material that they didn't have and for a delivery they didn't—they couldn't—they couldn't meet.

Around that same time—in March 2021—Alum's assets were sold to Energy Shield USA, LLC, an entity that had Anderson's wife as its managing member. Anderson testified that Energy Shield was a "rebrand" of Alum and that Alum's operations began to be transitioned to Energy Shield in March 2021. Anderson stated that Energy Shield was going to continue selling radiant barriers and that he was employed by Energy Shield at the time of the injunction hearing. Garcia likewise testified that he was employed by Energy Shield at the time of the injunction hearing and that he planned to continue to compete against Innovative through Energy Shield.

At the injunction hearing, Innovative procured the testimony of Brock Emmons, the owner of Triangle Radiant Barrier, a construction company in North Carolina, to demonstrate that it was losing business due to Appellants' solicitation of its customers. Emmons testified that Triangle had been one of Innovative's customers for around a decade. Emmons also testified that "four or five days" prior to the hearing,[10] he discovered that material that he had ordered from Innovative through Herman Torres was not coming from Innovative but from a different entity.

_____

[10]The temporary injunction hearing took place over two days on May 25, 2021, and May 27, 2021. Emmons testified on May 27, 2021.

As explained by Emmons, an order that he had placed through Herman Torres had been late, and Emmons had reached out to Innovative to discuss the order, and Innovative personnel did not know about it. During his conversation with Innovative, Emmons discovered that Herman Torres was no longer employed by Innovative and that the material that Triangle had been purchasing since January 2021 was not coming from Innovative. Emmons testified that two days before the injunction hearing, he had received a shipment that he had ordered from Herman Torres that was shipped from "Energy Shield USA . . . from an Aaron Garcia." Emmons testified that Herman Torres never informed him that he was no longer working for Innovative and that Triangle was not informed that it would be receiving product from a company other than Innovative.

At the injunction hearing, Russell testified that Innovative's sales had been "going down every year" for the last three years and that if Innovative lost more customers, it would "probably go broke this year." At the hearing, Anderson, Garcia, Herman Torres, and Iris Torres each testified that they did not have Innovative's customer lists in their respective possessions.

## G. Innovative's Lawsuit and the Temporary Injunction Order

In April 2021, Innovative filed a lawsuit against Appellants. In its live petition, Innovative alleged breach of fiduciary duty, breach of contract, and violation of the Texas Theft Liability Act against Anderson, Garcia, and Herman Torres, misappropriation of trade secrets against Anderson, Garcia, Herman Torres, Iris

11

Torres, and RBS, and harmful access by computer against Anderson. Innovative sought and obtained a temporary restraining order enjoining Appellants from certain activities.[11]

The trial court signed its temporary injunction order the day after the hearing. The order restrained Anderson, Garcia, Herman Torres, and Alum, in addition to "their officers, agents, servants, employees, attorneys, and those persons or entities in active concert or participation with them," from, among other things, "[s]oliciting Innovative's customers identified in Exhibit A attached [to the order], including such customers' management, employees, agents, and representatives." The order also restrained Iris Torres and RBS from "[s]oliciting customers of Innovative based upon information provided to Iris Torres or [RBS], by Herman Torres, which customers are listed on Exhibit A." This interlocutory appeal followed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (authorizing appeal from an interlocutory order granting or refusing a temporary injunction).

---

[11]Innovative's original petition was filed against Anderson, Garcia, Alum, and another party who was later dismissed from the lawsuit, and the temporary restraining order initially restrained only those parties. Herman Torres, Iris Torres, and RBS were later added to the lawsuit, and the temporary restraining order was amended to include those parties and extended by agreement of the parties.

## III. DISCUSSION

### A. Standard of Review

In an appeal from an order granting a temporary injunction, our scope of review is restricted to the validity of the order granting relief. *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 220 (Tex. App.—Fort Worth 2009, pet. denied). The decision to grant or deny a request for a temporary injunction is within the trial court's discretion, and we will not reverse its decision absent an abuse of discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g); *Frequent Flyer Depot*, 281 S.W.3d at 220. Our review does not include the merits of the underlying case but is strictly limited to determining whether there has been a clear abuse of discretion by the trial court in determining whether the applicant is entitled to a preservation of the status quo pending trial on the merits. *Henry v. Cox*, 520 S.W.3d 28, 33–34 (Tex. 2017); *Brooks v. Expo Chem. Co., Inc.*, 576 S.W.2d 369, 370 (Tex. 1979). Indeed, because the "effect of a premature review of the merits is to deny the opposing party the right to trial by a jury . . . it will not be assumed that the evidence taken at a preliminary hearing on [a] temporary injunction will be the same as the evidence developed at a trial on the merits." *Brooks*, 576 S.W.2d at 370.

When reviewing a trial court's order granting a temporary injunction, we must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion. *Frequent Flyer Depot*, 281 S.W.3d

13

at 220. A trial court does not abuse its discretion if it bases its decision on conflicting evidence and at least some evidence in the record reasonably supports the trial court's decision. *Id.*

## B. Appellants' Complaint that the Trial Court May Not Enjoin Them From Soliciting Innovative's Customers

In their first issue, Appellants argue that the record does not contain a non-solicitation agreement between them and Innovative for the trial court to enforce. Appellants cite authority holding that in the absence of a non-solicitation agreement, a trial court may not enjoin a former employee from soliciting the employer's customers, and that a trial court may only enjoin the use of the employer's confidential information. *See Heat Shrink Innovations, LLC v. Med. Extrusion Tech.-Tex., Inc.*, No. 02-12-00512-CV, 2014 WL 5307191, at \*9 (Tex. App.—Fort Worth Oct. 16, 2014, pet. denied) (mem. op.); *Gonzales v. Zamora*, 791 S.W.2d 258, 268 (Tex. App.—Corpus Christi 1990, no writ). According to Appellants, the record does not contain any competent evidence of a non-solicitation agreement because "no paro[l] evidence was proffered by [Innovative] at trial regarding the alleged employment agreement with either Anderson, Garcia, or Herman Torres." *See Bank of Am. v. Haag*, 37 S.W.3d 55, 58 (Tex. App.—San Antonio 2000, no pet.) ("When a written, signed contract is lost or destroyed such that the party seeking to prove or enforce the agreement is unable to produce the written agreement in court, the existence and terms of the written contract may be shown by clear and convincing parol evidence.").

We disagree with Appellants' contention that the record does not contain any competent evidence of a non-solicitation agreement. Here, the record reflects that Innovative has required its employees to sign an employment agreement for "[w]ell over 20 years" and that the employment agreement has not changed "for the last 15 years." Even Anderson admitted that Innovative's employees "were supposed to sign" an employment agreement, and his job duties included having employees sign the employment agreement. At the temporary injunction hearing, portions of the form employment agreement were admitted into evidence, including a portion containing a non-solicitation agreement that prohibited employees from seeking to procure orders or do business with any of Innovative's customers for a period of two years following the employee's termination.

Russell testified at the hearing that Anderson, Garcia, and Herman Torres had each signed an employment agreement like the form employment agreement that was admitted into evidence, and Russell further testified that he had countersigned each of the agreements. The record further shows that Anderson and Herman Torres began their respective employments with Innovative in 2010 and that Garcia began his employment with Innovative in 2008—each during the "last 15 years" that the employment agreement had not been changed. While Russell testified unequivocally that Anderson, Garcia, and Herman Torres had each signed an employment agreement, Anderson, Garcia, and Herman Torres could not recall whether they had signed an employment agreement. Finally, evidence was presented that Innovative's

employment agreements were kept under lock and key in Anderson's office and that following the subject resignations, Russell looked through the files and found that "everybody had their agreements [in the files] except [for Anderson, Garcia, and Herman Torres]." Based on this evidence, we hold that the trial court had competent evidence before it that Anderson, Garcia, and Herman Torres had entered into non-solicitation agreements with Innovative that prohibited them from soliciting Innovative's customers for a period of two years following their 2021 resignations.

The record further reflects that Anderson and Garcia are using Alum and its "rebrand" of Energy Shield to solicit Innovative's customers and that Herman Torres is using Iris Torres and RBS to solicit Innovative's customers. Anderson and Garcia operated Alum while they were working for Innovative and some of Alum's customers were prior customers of Innovative. Alum was "rebranded" as Energy Shield, and Triangle, a longtime customer of Innovative, was delivered product from "Energy Shield . . . from [Garcia]" just days before the injunction hearing. The record further shows that Iris Torres operated RBS when Herman Torres was employed there and that she continues to operate RBS. While Iris Torres initially testified that RBS had not received any customers from her husband's leads, she later qualified that answer by stating that RBS had obtained leads from her husband "maybe . . . a couple of times[.]" Evidence was also presented that Herman Torres directed RBS to fulfill an order that Innovative purportedly could not fulfill for 84 Lumber and that Iris Torres completed an ACH form so that RBS could get paid for the order. Iris Torres

16

later sent an email to a representative of 84 Lumber giving her contact information and requesting that 84 Lumber contact her regarding the matter. Finally, the record reflects that around the time that Herman Torres resigned from Innovative, he sent an email to a representative of 84 Lumber directing it to change its supplier of house wrap to RBS, and he provided 84 Lumber with an address used by both RBS and Alum.

Based on this record, we cannot say that the trial court abused its discretion by prohibiting Anderson, Garcia, Herman Torres, and Alum from soliciting the customers identified in the exhibit attached to the order, nor did it abuse its discretion by prohibiting Iris Torres and RBS from soliciting the customers identified in the exhibit based upon information provided to them by Herman Torres.[12] *See York v. Hair Club for Men, L.L.C.*, No. 01-09-00024-CV, 2009 WL 1840813, at *6 (Tex. App.—Houston [1st Dist.] June 25, 2009, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by granting temporary injunction prohibiting former employees and their new employers from soliciting the customers of the employees' former employer where the former employees had signed an agreement with the

---

[12]In their reply brief, Appellants contend for the first time that "no evidence was adduced at trial concerning the customers with whom each Appellant had dealings while employed with [Innovative]." But, "[a] party may not raise new issues for the first time on appeal in a reply brief." *Crowder v. Scheirman*, 186 S.W.3d 116, 119 n.1 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We thus do not consider the new argument raised in Appellants' reply brief.

17

former employer prohibiting such post-employment solicitation). We overrule Appellants' first issue.

## C. Appellants' Complaint that the Temporary Injunction is Vague, Ambiguous, and Unspecific as to Iris Torres and RBS

In their second issue, Appellants argue that the temporary injunction is vague, ambiguous, and unspecific as to Iris Torres and RBS. Appellants spend just over one page of their brief arguing this issue, and the crux of their argument seems to be that they think it is unclear whether "Iris Torres and RBS [are] prohibited from soliciting [Innovative's] customers that are listed in Exhibit A of the Order, or [whether] Iris Torres and RBS [are] permitted to solicit [Innovative's] customers so long as they do not receive any of the customer information listed in Exhibit A of the Order from Herman Torres[.]"

Rule 683 of the Texas Rules of Civil Procedure provides that "[e]very order granting an injunction . . . shall be specific in terms [and] shall describe in reasonable detail . . . the act or acts sought to be restrained[.]" Tex. R. Civ. P. 683. We do not think that the temporary injunction order is vague, ambiguous, or unspecific with respect to Iris Torres and RBS. The order states, in pertinent part, that Iris Torres and RBS are enjoined from "[s]oliciting customers of Innovative based upon information provided to Iris Torres or [RBS], by Herman Torres, which customers are listed on Exhibit A." To us, this language has only one meaning: that Iris Torres and RBS are enjoined from soliciting the customers on the exhibit attached to the

18

order if they obtained information relating to the customer from Herman Torres. *See*

*Berry v. Berry*, No. 13-18-00215-CV, 2019 WL 6606157, at *5 n.7 (Tex. App.—Corpus

Christi Dec. 5, 2019, pet. denied) (mem. op.) (looking to the "plain language of the

injunction" to determine whether certain conduct would be in violation of the

injunction); *see also Ramirez v. Ignite Holdings, Ltd.*, No. 05-12-01024-CV, 2013 WL

4568365, at *4 (Tex. App.—Dallas Aug. 26, 2013, no pet.) (mem. op.) ("An injunction

that prohibits a party from soliciting customers on lists that are exhibits to the

injunction is sufficiently detailed and specific."). If the trial court had intended

Appellants' other proffered interpretation—a blanket prohibition of Iris Torres's and

RBS's ability to solicit the customers on the attached exhibit—the trial court could

have simply said so. Indeed, the trial court's order pertaining to Anderson, Garcia,

Herman Torres, and Alum contains such a blanket prohibition.[13] We overrule

Appellants' second issue.

## D. Appellants' Complaint that There is Insufficient Proof that But For the Temporary Injunction, Innovative Would Suffer a Probable, Imminent, and Irreparable Injury

To obtain a temporary injunction, an applicant must plead and prove three

specific elements: (1) a cause of action against the defendant; (2) a probable right to

the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

---

[13]That portion of the order states, in pertinent part, that Anderson, Garcia, Herman Torres, and Alum are enjoined from "[s]oliciting Innovative's customers identified in Exhibit A attached [to the order] . . . ."

*Butnaru*, 84 S.W.3d at 204. In their third issue, Appellants argue that there is insufficient proof to support the third element—that is, that there is insufficient proof that but for the temporary injunction, Innovative would suffer a probable, imminent, and irreparable injury. With respect to this third element, we have held that "[w]hen a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed" and that "[t]he threatened disclosure of trade secrets constitutes irreparable injury as a matter of law." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.).

Here, Appellants place great emphasis on testimony from Anderson, Garcia, Herman Torres, and Iris Torres that they did not have Innovative's customer lists in their possession at the time of the temporary injunction hearing. Appellants' assertions that they do not possess Innovative's customer lists are not the only evidence that the trial court could have relied upon in finding that Innovative would suffer a probable, imminent, and irreparable injury but for the temporary injunction. To that end, the record reflects that just a few days prior to the conclusion of the temporary injunction hearing—and just days prior to the trial court's injunction order—Triangle, a longtime customer of Innovative, received a shipment that it had ordered through Herman Torres at Innovative. But rather than coming from Innovative, the shipment came from "Energy Shield . . . from [Garcia]." Triangle's owner, Emmons, testified that he was never informed that Herman Torres was no longer working for Innovative or that Triangle would be receiving product from a

company other than Innovative. The record also reflects that Herman Torres had the contacts for Innovative's customers on his cell phone. Thus, one reasonable interpretation is that Herman Torres was using Innovative's customer information to funnel sales to Energy Shield, the successor entity of Alum that employed Anderson and Garcia. *See Frequent Flyer Depot*, 281 S.W.3d at 220.

The record also contains testimony from Iris Torres that RBS had obtained leads from Herman Torres "maybe . . . a couple of times." It further reflects that Herman Torres diverted Innovative's delivery of product for 84 Lumber to RBS when Innovative purportedly could not fulfill the order. And it contains an April 2021 email from Iris Torres to a representative of 84 Lumber in which she informed the representative that she had filled out an ACH for RBS so that it could receive payment, and she requested that she be contacted by 84 Lumber. A month prior to that email, Herman Torres sent an email to a representative of 84 Lumber directing it to "change the name of the company that supplies you with house wrap to: [RBS]." One reasonable interpretation is that Herman Torres was using Innovative's customer information to transfer sales to his wife's business, RBS. *See id.*

Thus, viewing the evidence in the light most favorable to the trial court's order and indulging every reasonable inference in its favor, some evidence supports the trial court's conclusion that Innovative would suffer a probable, imminent, and irreparable injury if injunctive relief is not granted. *See Miller v. Talley Dunn Gallery, LLC*, No. 05-15-00444-CV, 2016 WL 836775, at *6 (Tex. App.—Dallas Mar. 3, 2016, no pet.)

21

(mem. op.) (stating "[t]he interruption of business relations and the disclosure of trade secrets can constitute irreparable harm that entitles the applicant to injunctive relief" and finding sufficient evidence of a probable, imminent, and irreparable injury where appellant distributed appellee's confidential information without appellee's knowledge or consent and communicated with appellee's customers with the intent to interfere with appellee's business relationships); *Correa v. Hous. Surgical Assistant Servs., Inc.*, No. 14-12-01050-CV, 2013 WL 3958499, at *10, 11 (Tex. App.—Houston [14th Dist.] July 30, 2013, no pet.) (mem. op.) (stating "there is no abuse of discretion in granting a temporary injunction when the enjoined conduct threatens to disrupt an ongoing business" and finding sufficient evidence of a probable, imminent, and irreparable injury where surgical assistants had non-compete agreement with surgical-support company, where surgical-support company gave surgical assistants confidential information, and where surgical assistants violated their non-compete agreement by "working in the same hospitals with the same surgeons [and in] at least one circumstance, the surgeon was not even aware that one of [the surgical assistants] was not still working for [surgical-support company]"); *IAC, Ltd.*, 160 S.W.3d at 200 ("When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed.").

Appellants also complain that "the reasons in the Order concerning [Innovative's] resulting injuries, if an injunction is not issued in this case, are conclusory and/or not specific" and fail to meet the requirements of Rule 683. We

22

disagree. In its temporary injunction order, the trial court explained that Innovative's "confidential information includes its customer list . . . which constitute[s] [a] trade secre[t] owned by Innovative."[14] The order also explained that Innovative had "expended time, money, and resources to develop, compile, and improve its confidential information over more than thirty years" and that Innovative protects its confidential information by "adopting policies as set forth in an employee policy manual that prohibit employees from disclosing [the] confidential information" and by "maintaining [the] confidential information in an electronic format that can only be accessed by password and keeping physical documents reflecting [the] confidential information . . . at its facility which is protected from unauthorized access by a security system."

As to resulting injuries, the order stated that "[t]he nature of the injury includes both the damage to Innovative's business relationships with its customers and the destruction and devaluation of Innovative's confidential information and trade secrets." The order noted that the injury would take place "in the form of lost goodwill, market share, and lost business." The order further explained that if

---

[14]Under Section 134A.002(6) of the Texas Civil Practice and Remedies Code, a "trade secret" includes "all forms and types of information, including . . . [a] list of actual or potential customers" if the owner of the trade secret "has taken reasonable measures under the circumstances to keep the information secret" and if the "information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).

23

Innovative's confidential information and trade secrets were not protected, "their value [would] be destroyed and rendered useless." We conclude that the trial court's findings of probable, imminent, and irreparable harm are sufficiently specific to comply with the requirements of Rule 683, and we thus hold that the trial court did not abuse its discretion by making such findings. *See* Tex. R. Civ. P. 683; *Miller*, 2016 WL 836775, at *6 (upholding injunction that identified harm as "jeopardiz[ing] appellees' confidential information, employment relations, existing and prospective business relationships, reputation, and goodwill"); *see also Smith v. Nerium Int'l*, No. 05-18-00617-CV, 2019 WL 3543583, at *14–15 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op.) ("[W]e conclude that the injunction is specific enough to satisfy Rule 683 because it supplies details about why Nerium would suffer injury if the injunction were not granted, tells appellants why the court issued the injunction, and allows us to review it."). We overrule Appellants' third issue.

## IV. CONCLUSION

Having overruled Appellants' three issues, we affirm the trial court's temporary injunction order.

/s/ Dana Womack

Dana Womack
Justice

Delivered: December 2, 2021

24